616 A.2d 17

**Theresa SMITH, Appellee,**

v.

**Ronald MITCHELL d/b/a Beer Mart, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 2, 1992.

Filed Nov. 10, 1992.

138

Robert S. Teti, West Chester, for appellant.

Robert P. Brendza, Downingtown, for appellee.

Before CIRILLO, POPOVICH and HOFFMAN, JJ.

POPOVICH, Judge.

We are asked to review the judgment entered January 28, 1992, in favor of the plaintiff, Theresa Smith, and against the defendant, Ronald Mitchell, d/b/a Beer Mart. We affirm.

The facts evidence that on July 13, 1976, Rudolph Tavani (now deceased) and Ronald Mitchell entered into an agreement whereby Tavani loaned $30,000.00 to Mitchell, repayment of which was to be made over a 15–year period at a rate of $360 the first of each month.[1]

Mitchell paid $47,160.00 (in 131 payments) before ceasing to honor the July 13, 1976, loan agreement. As a result, Theresa Smith, the sole beneficiary of her mother's estate following her father's, Mr. Tavani's, death, instituted suit to collect the balance claimed owed under the loan agreement, i.e., $13,-907.51. In an answer with new matter, Mitchell alleged that the July 13th agreement was entered into by mutual mistake

---

1. The entire loan agreement consisted of the following:
   Thriftway Beverage Co.
   West Chester, Penna.
   Attention: Mr. Ron Mitchell
   As per our verbal agreement, this will confirm the basis for entering into a Loan Agreement, with Rudy Tavani, in the amount of $30,000.

   | AMOUNT OF LOAN | $30,000 |
   | PAYABLE | $360.00 per month |
   | LENGTH OF LOAN | 15 year period |

   Payments are to be made the first of each month, payable to Rudy Tavani.

   /s/Ronald Mitchell

   RON MITCHELL

   CC: R. Tavani
   R. Mitchell                           7/13/76

in that the monthly payments incorrectly included an interest rate of 12% instead of the intended 8.75% orally agreed to by the parties at the inception of the agreement.

It was Mitchell's position that he had repaid the amount borrowed from Tavani when calculated at the intended 8.75% rate of interest over 15 years. Further, he urged that the interest rate charged was usurious under 41 P.S. § 101 *et seq.*[2] and he was entitled to reimbursement in the amount of triple the excess paid in interest over the legal rate of 6%. *Id.* at § 502.

The dispute was heard initially by a panel of three arbitrators and resulted in an award in favor of the plaintiff/Smith. At a *de novo* bench trial, the defendant/Mitchell conceded borrowing money from Tavani and executing the July 13th note evidencing the terms and conditions of the loan agreement. Mitchell also admitted making monthly payments to the Tavani family, the money for which was drawn from his business account since the loan was used to enlarge his beer distributorship.

At the completion of the trial, the court found for the plaintiff in the amount of $16,626.43, and the order was reduced ultimately to judgment.

It is Mitchell's contention that the money advanced by Tavani was in the nature of a "personal" loan and, as such, was subject to the maximum lawful rate of interest chargeable under the law of 6% per annum. Consequently, he assigns the trial court with the commission of error (as a matter of law) in holding that the transaction was a "business" loan and excepted from the 6% rate of interest.

■ If there is anything well-established in the law it is the regulation of the rate of interest is a subject within the police power of the State, and this is especially true in the case of loans because the business of making such loans profoundly

2. The Act of January 30, 1974, P.L. 13, No. 6, as amended April 6, 1979, P.L. 15, No. 4, § 1, 41 P.S. § 101 *et seq.* (1992) (hereinafter referred to as the Usury Law).

affects the social life of the community. See *Equitable Credit & Discount Co. v. Geier,* 342 Pa. 445, 21 A.2d 53, 58 (1941).

It is elementary that the subject of the maximum amount to be charged by persons or corporations subject to the jurisdiction of a state for the use of money loaned within the jurisdiction of the state is one within the police power of such state. The power to regulate existing, the details of the legislation and the exceptions proper to be made rest primarily within the discretion of the state legislature, and "unless such regulations are so unreasonable and extravagant as to interfere with property and personal rights of citizens, unnecessarily and arbitrarily, they are within the power of the state...."

*Griffin v. Connecticut,* 218 U.S. 563, 569, 31 S.Ct. 132, 133, 54 L.Ed. 1151 (1910), quoting *Watson v. Maryland,* 218 U.S. 173, 30 S.Ct. 644, 646, 54 L.Ed. 987 (1910).

■ At common law the taking of any interest whatever was illegal, and the right to charge it, being a privilege granted by statute, is subject to legislative control. *Commonwealth v. Puder,* 261 Pa. 129, 137, 104 A. 505, 507 (1918). In this Commonwealth, the collection of interest is controlled by the Usury Law,[3] which designates the Secretary of Banking to prescribe regulations to carry out the purposes of the Act. 41 P.S. § 601. Some of the purposes to be achieved are set forth in the Historical and Statutory Notes following the "Definitions" portion of 41 P.S. § 101 and reads:

An Act regulating agreement for the loan or use of money; establishing a maximum lawful interest rate in the Commonwealth; providing for a legal rate of interest; detailing exceptions to the maximum lawful interest rate for ... business loans in excess of ten thousand dollars[.]

See also 41 P.S. §§ 201, 202. The exceptions to maximum legal rate of interest (6%) for loans of $50,000.00 or less is detailed in Section 301, which reads in relevant part:

(f) The maximum lawful rate of interest set forth in this section and in Article II of this act [41 P.S. §§ 201 and 202]

3. See note 2, supra.

shall not apply to ... (v) *business loans* the principal amount of which is in excess of ten thousand dollars ($10,-000).

The Act of January 30, 1974, P.L. 13, No. 6, as amended, October 5, 1978, P.L. 1127, No. 264, § 2, 41 P.S. § 301(f) (1992) (Emphasis added).

To effectuate the intention of the Usury Law, the Legislature has imbued the Secretary of Banking with the authority to prescribe regulations toward that end.[4] In compliance therewith, the Secretary of Banking has promulgated regulations appearing in Chapter 7 of the Pennsylvania Code, wherein the scope of the Chapter is explained as encompassing "the establishment of lawful interest rates for various types of transactions." 10 Pa.Code § 7.1. And, in the "Definitions" portion, "business loans" is defined; to-wit:

*Business loans*—for the purposes of the act shall mean extensions of credit where the funds are to be utilized in a business enterprise and where the following conditions exist:

(i) the borrower exercises actual control over the managerial decisions of the enterprise in which funds are to be utilized.

(ii) the borrower signs an affidavit under penalty of perjury setting forth the intended use of proceeds.

10 Pa.Code § 7.2(i)(ii).

■■■ Generally, the rules and regulations of an administrative agency are subject to the same principles of construction that apply to construing statutes. *Gaibis v. Werner Continental, Inc.*, 565 F.Supp. 1538, 1548 (W.D.Pa.1983). In other words, the plain language of the regulations and the ordinary meanings of the words therein are the starting points in construing the regulations and will be determinative unless there is an apparent ambiguity or expression of legislative intent to the contrary. *Bread Political Action Committee v. Federal Election Commission*, 455 U.S. 577, 580, 102 S.Ct.

---

**4.** The provisions of Chapter 7 were issued under the Act of January 30, 1974, P.L. 13, No. 6, as amended April 6, 1979, P.L. 15, No. 4, § 1, 41 P.S. § 101 *et seq.*

1235, 1237, 71 L.Ed.2d 432 (1982); 1 P.L.E. Administrative Law & Procedure, § 54 (1986).

■ Further, it is a well-known rule of statutory construction that sections of a statute or regulations must be construed with reference to the entire section or statute. See *Westmoreland Manor v. Com. Dept. of Public Welfare*, 91 Pa.Cmwlth. 155, 496 A.2d 1282, 1286 (1985); see also *Dept. of Public Welfare v. Woolf*, 276 Pa.Super. 433, 419 A.2d 535, 537–38 (1980) ("In interpreting a statute, it must be construed as an integral part of the whole structure affected and not a separate matter housing an independent meaning of its own."). Thus, the "affidavit" provision of 10 Pa.Code § 7.2(ii) must not be read out of context.

■ As recounted supra, the purpose of the Usury Law is to set forth the legal rate of interest in this Commonwealth and to detail exceptions to the maximum lawful rate for, *inter alia*, business loans in excess of ten thousand dollars. Additionally, as we read the Usury Law, its thrust is to protect the citizenry of this Commonwealth from being exploited at the hands of unscrupulous individuals seeking to circumvent the law at the expense of *unsuspecting* borrowers who may have no other avenue to secure financial backing for a, for example, business venture. The facts at bar are far from such a scenario; to-wit:

1) Appellant was the sole proprietor of a business seeking a source of revenue to expand his operation;

2) Tavani offered to loan a fixed amount to the appellant to achieve his objective under a written agreement which contained clear and unequivocal terms relating to repayment;

3) Appellant accepted the terms of the loan without question, as evidenced by his faithful payment of the amount stipulated to for approximately eleven (11) years; and

4) Appellant voiced his objections to the rate of interest only after Tavani had died by alleging mutual mistake with regard to the rate of interest charged on the loan.

Under the conditions herein stated, we deem it appropriate to look to principles of equity to ameliorate a resolution of the dispute. In doing so, we make reference to the observations in *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584 (1984), with regard to the application of equity in determining interest as an element of damages; to-wit:

> ... in contracts concerning payment of a sum of money, which bear an interest rate higher or lower than the legal rate; if the parties do not contract that it shall be the rate after the debt becomes due; then, the interest rate fixed by law attaches for the detention of the principal sum.

    \*      \*      \*      \*      \*      \*

A review of the case law reveals that the trend of the courts has been to take an equitable approach in determining interest as an element of damages. *See, E.I. DuPont de Nemours & Co. v. Lyles & Lang Construction Co.*, 219 F.2d 328 (4th Cir.1955) (interest to be awarded not at legal rate, but at rate plaintiff would have had to pay upon loan of similar amount in view of state money market); *Davis Cattle Co. v. Great Western Sugar Co.*, 544 F.2d 436 (10th Cir.1976) (interest awarded at 11.5% per annum, not statutory rate of 6%); *Peterson v. Crown Financial Corp.*, 553 F.Supp. 114 (E.D.Pa.1982) (interest awarded at rate of 2½% above prime rate); *Nedd v. United Mine Workers of America*, 488 F.Supp. 1208 (M.D.Pa.1980) (no interest awarded where union did not benefit from breach of trust).... The Pennsylvania courts have also adopted this approach, and in equity cases, the award and rate of interest allowed is at the discretion of the chancellor. *Sack v. Feinman*, 489 Pa. 152, 413 A.2d 1059 (1980) ...; Our Supreme Court in *Murray Hill Estates, Inc. v. Bastin*, 442 Pa. 405, 410, 276 A.2d 542, 545 (1971), stated as follows:

> *An examination of the cases dealing with the charge and allowance of interest will disclose many difficulties, but the decided trend of courts of law and courts of equity has been "to break away from hard and fast rules and charge and allow interest in accordance with principles*

*of equity, in order to accomplish justice in each particu-
lar case".*

*\* \* \* Unless a case be found, which is a conclusive
precedent, the safest and at the same time the fairest way
for a court is to decide questions pertaining to interest
according to a plain and simple consideration of justice
and fair dealing.*

quoting *McDermott v. McDermott,* 130 Pa.Super. 127, 130,
196 A. 889, 890 (1938).

326 Pa.Super. at 36–37, 473 A.2d at 595–96 (Citations omitted;
emphasis added).

■ Consistent with *Daset Mining Corp.,* supra, we find
that, despite the absence of a *formal* compliance with the
affidavit criterion at 10 Pa.Code § 7.2(ii), the objective sought
to be satisfied with the use of an "affidavit"—confirmation by
oath or affirmation of the party making a written declara-
tion [5]—has been obviated by the appellant's admission in court
to the intended purpose for which the money was loaned.
N.T. 10/1/90 at 26. Moreover, as noted by the trial court on
this point:

In the case at hand, there is no doubt that the loan qualifies
as a business loan. . . . Both parties to the loan understood
that the loan was to be used to expand Defendant[/Mitch-
ell's] beverage business. Defendant repaid the loan using
business checks and he testified that he used the money
exclusively for business purposes (N.T. p. 7, 25, 26). Addi-
tioanlly [*sic* ], since the business was Defendant's own, there
is no question that he had actual control over managerial
decisions of the business.

Finally, we came to the final condition in the definition
concerning an affidavit [as appears in 10 Pa.Code § 7.2(ii) ].
This Court finds that such an affidavit is important only in
cases where the use of the loan monies is ambiguous or
unclear or where one party claims the loan was not for
business purposes.

5. See Black's Law Dictionary 54 (5th ed. 1979).

In the situation such as here, where all knew that the money was to be, and in fact was, used in Defendant's business, it would be absurd to hold that the loan was not a business loan. Therefore, an affidavit in such a case as this would be an unnecessary formality.

Trial Court Opinion at 4. We agree and look to the trial court's logic as a supplement to our own determination to affirm the judgment appealed.

We find that, given the particular facts of this case, the absence of the signing of an "affidavit" by the appellant-borrower, as called for by 10 Pa.Code § 7.2(ii), is not fatal to the enforceability of the contract. Rather, in deciding the question of interest to be paid, a plain and simple consideration of justice and fair dealing compel that the appellant be required to repay the principal and interest due under the July 13, 1976, contract. See *Daset Mining Corp.,* supra.

Judgment affirmed.